**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| SAM NOURANI, derivatively on behalf of ENVISION HEALTHCARE CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>CHRISTOPHER A. HOLDEN, WILLIAM A. SANGER, CLAIRE M. GULMI, RANDEL G. OWEN, MICHAEL L. SMITH, RONALD A. WILLIAMS, MARK V. MACTAS, RICHARD J. SCHNALL, CAROL J. BURT, JAMES D. SHELTON, LEONARD M. RIGGS, JR., M.D., JAMES A. DEAL, JOHN T. GAWALUCK, STEVEN I. GERINGER, JOEY A. JACOBS, KEVIN P. LAVENDER, and CYNTHIA S. MILLER<br><br>Defendants,<br><br>and<br><br>ENVISION HEALTHCARE CORPORATION,<br><br>Nominal Defendant. | **Case No. _______________**<br><br>**DEMAND FOR JURY TRIAL** |

## SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Sam Nourani ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Envision Healthcare Corporation ("Envision" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Christopher A. Holden, William A. Sanger, Claire M. Gulmi, Randel G. Owen, Michael L. Smith, Ronald A. Williams, Mark V. Mactas, Richard J. Schnall, Carol J. Burt, James D. Shelton, Leonard M. Riggs, Jr. M.D., James A. Deal, John T. Gawaluck, Steven I. Geringer, Joey A. Jacobs, Kevin P.

Lavender, and Cynthia S. Miller (collectively, the "Individual Defendants," and together with Envision, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Envision, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Envision, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Envision's directors and officers.

2. Envision Healthcare Holdings, Inc. ("Envision Holdings") and AmSurg, Inc. ("AmSurg") consummated a merger on December 1, 2016 (the "Merger"). The combined entity is known as Envision Healthcare Corporation.

3. Envision, via its subsidiary, EmCare, provides physician services in emergency rooms throughout the United States. EmCare was a part of Envision Holdings prior to the Merger.

4. From March 2, 2015 through the present day (the "Relevant Period"), the Company engaged in an illegal scheme to increase revenues and inflate the Company's stock price by ordering tests that were medically unnecessary; billing for complex, expensive medical care where such care was medically unwarranted; and admitting emergency room patients into hospitals for financial reasons when such admission was not medically necessary. Further, the Individual Defendants caused Envision to engage in a practice known as "surprise billing," whereby patients seeking treatment at in-network facilities were treated by out-of-network physicians, causing those patients to be billed at higher rates.

5. On July 24, 2017, *The New York Times* published an article titled "The Company Behind Many Surprise Emergency Room Bills," which reported the pattern of increased out-of-network bills, hospital admissions, and highest-level codes when EmCare came into a number of hospitals' emergency departments.

6. Following *The New York Times* publication, the Company's share price dropped $2.33, or 3.7%, to close at $60.28 on July 24, 2017.

7. On September 18, 2017, the Company filed a Form 8-K with the SEC, announcing the departure of its Chief Financial Officer ("CFO"), Claire Gulmi, the departure of the President of its Physician Services Group, and the creation of a new Chief Operating Officer position.

8. On this news, the Company's share price dropped $4.56, or 9.5%, to close at $43.11 on September 19, 2017.

9. The Individual Defendants breached their fiduciary duties by causing the Company to: (1) order physicians to administer tests that were medically unnecessary, (2) order physicians to admit patients from the emergency room into hospitals when such admissions were not medically necessary in order to boost revenue, subjecting the Company to a qui tam lawsuit in which the U.S. Department of Justice (the "DOJ") has intervened; (3) bill for the most complex, expensive level of care in unwarranted situations; and (4) cause patients who sought treatment at in-network facilities to be treated by out-of-network physicians, thereby increasing billing rates and raising costs for patients and insurers (collectively, the "Healthcare Misconduct").

10. The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain internal controls.

11. Moreover, the Individual Defendants made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, prospects, and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal

sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls.

12. As a result of the foregoing, the Individual Defendants' and Company's public statements were materially false and misleading at all relevant times. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

13. Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while three of them engaged in lucrative insider sales, netting proceeds of over $39 million. Over 135,400 shares of the Company's common stock were repurchased between January and September 2017 for approximately $9.2 million. As the Company stock was actually only worth $43.11 per share during that time, the Company overpaid approximately $3.4 million in total.

14. The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected Envision subsidiary EmCare to a qui tam lawsuit pending before the U.S. District Court for the District of Columbia; the Company, its President and Chief Executive Officer ("CEO"), two former Chief Financial Officers ("CFO"), former CEO, and several current and former members of its Board[1] to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of Tennessee (the

[1] Specifically, the consolidated Securities Class Action names Christopher A. Holden, William A. Sanger, Claire M. Gulmi, Randel G. Owen, Ronald A. Williams, Mark V. Mactas, Michael L. Smith, Richard J. Schnall, Carol J. Burt, James D. Shelton, and Leonard M. Riggs, Jr. M.D.

"Consolidated Securities Class Action"); an investigation by U.S. Senator Claire McCaskill; the need to undertake internal investigations; losses due to the Company's overpayment of approximately $3.4 million for the repurchases of its own stock and the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company; and will cost the Company going forward many millions of dollars.

15. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and insider selling by three of them, including two of the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of six of them in the related Consolidated Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Envision Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Consolidated Securities Class Action based on violations of the Exchange Act.

18. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20. Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

21. Plaintiff is a current shareholder of Envision common stock. Plaintiff has continuously held Envision common stock at all relevant times.

### Nominal Defendant Envision

22. Nominal Defendant Envision is a Delaware corporation with its principal executive offices at 1A Burton Hills Boulevard, Nashville, TN 37215. It also maintains an executive office at 6363 S. Fiddler's Green Circle, 14th Floor, Greenwood Village, CO 80111. Envision stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "EVHC."

### Defendant Holden

23. Defendant Christopher A. Holden ("Holden") has served as the Company's President and CEO and Company director since December 2016. According to the Company's Schedule 14A filed with the SEC on April 13, 2017 (the "2017 Proxy Statement"), on March 29,

2017, Defendant Holden beneficially owned 557,066 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Holden owned over $34.7 million worth of Envision stock.

24. For the fiscal year ended December 31, 2016, Defendant Holden received $21,726,391 in compensation from the Company. This included $1,040,000 in salary, $19,000,000 in stock awards, $1,560,000 in non-equity incentive plan compensation, and $126,391 in all other compensation.

25. The Company's 2017 Proxy Statement stated the following about Defendant Holden:

> Mr. Holden, 53, has served as the President and Chief Executive Officer of the Company since December 2016. Prior to the Merger, Mr. Holden served as a director, President and Chief Executive Officer of AmSurg from October 2007 through November 2016. He served as Senior Vice President and a Division President of Triad Hospitals, Inc. from May 1999 through July 2007. From January 1998 through May 1999, Mr. Holden served as President of the West Division of the Central Group of Columbia/HCA Healthcare Corporation, now known as Hospital Corporation of America (HCA). Prior to January 1998, Mr. Holden served as President of the West Texas Division of the Central Group of HCA from September 1997 until January 1998 and Vice President of Administration for the Central Group of HCA from August 1994 until September 1997.

**<u>Defendant Gulmi</u>**

26. Defendant Claire M. Gulmi, Jr. ("Gulmi") served as the Company's CFO from the time of the Merger to October 2, 2017, and has since served as an Advisor to the Company. According to the Company's 2017 Proxy Statement, on March 29, 2017, Defendant Gulmi beneficially owned 119,772 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Gulmi owned over $7.4 million worth of Envision stock.

27. For the fiscal year 2016, Defendant Gulmi received $2,067,094 in compensation from the Company. This included $530,000 in salary, $1,060,000 in stock awards, $413,400 in non-equity incentive plan compensation, and $63,694 in all other compensation.

28. The Company filed a Form 8-K on December 7, 2016 which stated the following about Defendant Gulmi:

> Claire M. Gulmi is the Executive Vice President and Chief Financial Officer of the Company. Ms. Gulmi previously served as a director of AmSurg from 2004 to December 2016 and as AmSurg's Executive Vice President from February 2006 to December 2016 and Chief Financial Officer from September 1994 to December 2016. Prior to her appointment as Executive Vice President, Ms. Gulmi served as a Senior Vice President from March 1997 to February 2006 and as a Vice President from September 1994 through March 1997. Ms. Gulmi serves as a director of Air Methods Corporation, a medical transportation company.

**Defendant Sanger**

29. Defendant William A. Sanger ("Sanger") was the Executive Chairman of the Board of the Company, and served as Envision Holdings' President and CEO from May 2011 to November 2016. As of December 1, 2017, he became the non-executive Chairman of the Board. According to the 2017 Proxy Statement, on March 29, 2017, Defendant Sanger beneficially owned 251,264 shares of the Company's common stock.[2] Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Sanger owned over $15.6 million worth of Envision stock.

30. For the fiscal year ended March 31, 2017, Defendant Sanger received $6,931,984 in compensation from the Company. This included $1,670,131 in salary, $4,424,000 in stock awards, and $837,853 in all other compensation.

[2] Defendant Sanger had an additional 1,598,804 shares acquirable in 60 days, which, combined with the shares owned outright, represented 1.6% of all outstanding Company stock.

31. The Company's 2017 Proxy Statement stated the following about Defendant Sanger:

> Mr. Sanger, 66, serves as Executive Chairman and a director of the Company. Prior to the Merger, Mr. Sanger served as a director, the President and the Chief Executive Officer of EHH from May 2011 through November 2016, and served as Chairman of its board from November 2014 through November 2016. Prior to May 2011, Mr. Sanger served for over ten years as President and Chief Executive Officer of predecessor and affiliated entities of EHH. Mr. Sanger is also a co-founder of BIDON Companies, where he has been a Managing Partner since 1999. Mr. Sanger also serves as a director of Carestream Health, Inc. and Healogics, Inc.
>
> Mr. Sanger has more than 30 years of experience in the healthcare industry, and we believe his experience both as an entrepreneur and a seasoned public company executive, make him qualified to serve as a member of the Board.

32. During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Sanger made the following sales of Company stock (and made no purchases of Company stock). On April 16, 2015, Defendant Sanger sold 418,500 shares of Company stock for $40.00 per share. On August 11, 2015, Defendant Sanger sold 136,900 shares of Company stock for $43.84 per share. On August 12, 2015, Defendant Sanger sold 38,100 shares of Company stock for $43.64 per share. On September 11, 2015, Defendant Sanger sold 152,542 shares of Company Stock for $40.97 per share. On September 12, 2015, Defendant Sanger sold 22,458 shares of Company Stock for $41.69 per share. Thus, in total, before the fraud was exposed, he sold 768,500 Company shares on inside information, for which he received approximately $31.6 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**<u>Defendant Owen</u>**

33. Defendant Randel G. Owen ("Owen") served as Envision Holdings' CFO from February 2005 to December 2016, and was a director of Envision Holdings from August 2011 to February 2016. According to the 2017 Proxy Statement, on March 29, 2017, Defendant Owen beneficially owned 131,290 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Owen owned about $8.2 million worth of Envision stock.

34. For the fiscal year ended March 31, 2017, Defendant Owen received $2,244,431 in compensation from the Company. This included $796,923 in salary, $1,400,000 in stock awards, and $47,508 in all other compensation.

35. The Company filed a Form 8-K on December 7, 2016 which stated the following about Defendant Owen:

> Randel G. Owen is the Executive Vice President and President—Ambulatory Services Group of the Company. Mr. Owen previously served as a director of Holdings from August 2011 to February 2016, the Chief Financial Officer and Executive Vice President of Holdings from May 2011 to December 2016 and the Chief Operating Officer of Holdings from September 2012 to December 2016. He also served as Chief Financial Officer from February 2005 to December 2016 and as Executive Vice President from December 2005 to December 2016 of the Prior Envision Borrower and its predecessor. In addition, Mr. Owen has previously served as Executive Vice President and Chief Financial Officer of AMR. He joined EmCare in July 1999 and served as Executive Vice President and Chief Financial Officer from June 2001 to March 2003. Mr. Owen is also a director of First Cash Financial Services, Inc. Before joining EmCare, Mr. Owen was Vice President of Group Financial Operations for PhyCor, Inc., a medical clinic operator, in Nashville, Tennessee from 1995 to 1999. Mr. Owen has more than 30 years of financial experience in the healthcare industry.

36. During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Owen made the following sales of Company stock (and made no purchases of Company stock). On August 17,

2015, Defendant Owen sold 140,000 shares of Company stock for $44.22 per share. On September 15, 2015, Defendant Owen sold 20,000 shares of Company stock for $42.00 per share. Thus, in total, before the fraud was exposed, he sold 160,000 Company shares on inside information, for which he received approximately $7 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**Defendant Burt**

37. Defendant Carol J. Burt ("Burt") has served as a Company director since 2016, and was a director of Envision Holdings from August 2011 until the completion of the Merger. She is a member of the Audit Committee, and was a member of Envision Holding's Audit Committee prior to the merger. According to the 2017 Proxy Statement, on March 29, 2017, Defendant Burt beneficially owned 20,379 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Burt owned about $1.3 million worth of Envision stock.

38. For the fiscal year ended March 31, 2017, Defendant Burt received $223,750 in compensation from the Company. This included $123,750 in fees earned and $100,000 in stock awards.

39. The Company's 2017 Proxy Statement stated the following about Defendant Burt:

> Prior to the Merger, Ms. Burt, 59, served as a director of EHH from August 2011 through the completion of the Merger. Ms. Burt, principal of Burt-Hilliard Investments, is a private investor and serves on the Operating Council for Consonance Capital Partners, a private equity firm focused on investing in the U.S. healthcare industry. Ms. Burt was formerly an executive officer of WellPoint, Inc., where she served from 1997 to 2007, most recently as WellPoint's Senior Vice President, Corporate Finance and Development, from 2005 until 2007, helping to build WellPoint from a single state Blue plan to one of

> the country's leading health benefits companies. In her time at WellPoint, Ms. Burt was responsible for, among other things, corporate strategy, mergers and acquisitions, finance, treasury, and real estate management. In addition, WellPoint's financial services and international insurance business units reported to her. Ms. Burt also serves as a director of ResMed, Inc., a medical technology company specializing in equipment to treat sleep disordered breathing and other chronic diseases, as well as WellCare Health Plans, Inc., a provider of managed care services to government sponsored healthcare programs. Previously, Ms. Burt served on the boards of Vanguard Health Systems and Transitional Hospitals Corporation, both publicly traded corporations. In addition, Ms. Burt was Senior Vice President and Treasurer of American Medical Response and spent 16 years with Chase Securities (now J.P. Morgan), most recently as founder and head of the Health Care Investment Banking Group.
>
> We believe that Ms. Burt's over 30 years' experience in management, strategic planning, mergers and acquisitions, finance and operations in the managed care, healthcare services and banking industries are valuable assets to our Board.

**Defendant Miller**

40. Defendant Cynthia S. Miller ("Miller") has served as a Company director since 2016. She is a member of the Audit Committee and Chairs the Compliance Committee. According to the 2017 Proxy Statement, on March 29, 2017, Defendant Miller beneficially owned 16,251 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Miller owned over $1 million worth of Envision stock.

41. For the fiscal year ended March 31, 2017, Defendant Miller received $285,833 in compensation from the Company. This included $140,833 in fees earned and $145,000 in stock awards.

42. The Company's 2017 Proxy Statement stated the following about Defendant Miller:

> Ms. Miller, 60, served as a director of AmSurg from 2011 through the completion of the Merger. Ms. Miller served as Senior Vice President of Innovation and

> Pricing for Univita, a provider of extended care and home care services, from April 2011 until her retirement in June 2012. She served as an officer of WellPoint, Inc. from 2004 to December 2010, helping to build WellPoint into one of the country's leading health benefits companies. She served as an officer of its predecessor, Anthem, Inc., from 1986 to 2004. At WellPoint, Ms. Miller served from March 2008 to December 2010 as Executive Vice President and Chief Actuary, through which she was involved in pricing, product development, valuation, healthcare management support, mergers and acquisitions, forecasting and strategic planning related to health care reform. She also served from October 2006 to March 2008 as Senior Vice President and Chief Actuary, Commercial and Consumer Business and from January 2006 to October 2006 as Senior Vice President and Chief of Staff to the Chief Executive Officer of WellPoint, responsible for, among other things, the design and execution of key corporate management initiatives. During her tenure, she also had responsibility for the company's risk management functions and led its merger, acquisition and divestiture activities.
>
> We believe that Ms. Miller's 25 years of leadership experience in the management of managed care and integrated healthcare system management companies, and extensive experience in risk assessment and in strategic planning for healthcare companies qualify her to serve on our Board.

**Defendant Williams**

43. Defendant Ronald A. Williams ("Williams") served as a Company director from 2016 to October 27, 2017. He previously served as a director of Envision Holdings from May 2011 to November 2016. According to the 2017 Proxy Statement, on March 29, 2017, Defendant Williams beneficially owned 179,452 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Williams owned about $11.2 million worth of Envision stock.

44. For the fiscal year ended March 31, 2017, Defendant Williams received $207,083 in compensation from the Company, all in the form of stock awards.

45. The Company's 2017 Proxy Statement stated the following about Defendant Williams:

> Mr. Williams, 67, served as a director of EHH from May 2011 through November 2016, serving as Chairman of its board from May 2011 to November 2014, and lead director from November 2014 to April 2015. Mr. Williams has been an operating advisor to Clayton, Dubilier & Rice Fund VIII, L.P. since April 2011. Mr. Williams has served as the Chairman and Chief Executive Officer of RW2 Enterprises, LLC since April 2011. Previously, Mr. Williams was Chairman of Aetna Inc. After joining Aetna in 2001, he became President in 2002 and served as Chief Executive Officer from February 2006 to November 2010 and Chairman of the board from October 2006 to April 2011. Mr. Williams serves on the board of directors of American Express Company, The Boeing Company and Shelton & Shelton, as well as the Boards of the Peterson Institute for International Economics, and the National Academy Foundation.
>
> We believe that Mr. Williams' over 25 years of strategic, senior management and operations leadership experience in a rapidly changing and highly regulated industry, and his focus on innovation through information technology, qualifies him to serve on our Board.

**Defendant Gawaluck**

46. Defendant John T. Gawaluck ("Gawaluck") has served as a Company director since 2016. He is a member of the Audit Committee and the Compliance Committee. According to the 2017 Proxy Statement, on March 29, 2017, Defendant Gawaluck beneficially owned 6,080 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Gawaluck owned about $379,270 worth of Envision stock.

47. For the fiscal year ended March 31, 2017, Defendant Gawaluck received $262,500 in compensation from the Company. This included $117,500 in fees earned and $145,000 in stock awards.

48. The Company's 2017 Proxy Statement stated the following about Defendant Gawaluck:

> Mr. Gawaluck, 65, served as a director of AmSurg from 2015 through the completion of the Merger. Previously Mr. Gawaluck, a certified public

> accountant, worked for Ernst & Young LLP for 41 years until his retirement in 2014. Mr. Gawaluck was an assurance partner at Ernst & Young from 1985 through 2014, and served in a variety of client service and firm leadership roles. During his time at Ernst & Young, Mr. Gawaluck served as the coordinating and quality review partner for several large public companies. Mr. Gawaluck was an active member of Ernst & Young's global partner group, a strategy and knowledge sharing association of Ernst & Young partners serving its top 100 global clients.
>
> Mr. Gawaluck has over 40 years' experience in accounting and finance, including significant experience with respect to public company financial reporting, regulatory compliance and risk management. We believe Mr. Gawaluck is qualified to serve on our Board.

**Defendant Jacobs**

49. Defendant Joey A. Jacobs ("Jacobs") has served as a Company director since 2016. According to the 2017 Proxy Statement, on March 29, 2017, Defendant Jacobs beneficially owned 10,331 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Jacobs owned about $644,447 worth of Envision stock.

50. For the fiscal year ended March 31, 2017, Defendant Jacobs received $250,417 in compensation from the Company. This included $105,417 in fees earned and $145,000 in stock awards.

51. The Company's 2017 Proxy Statement stated the following about Defendant Jacobs:

> Mr. Jacobs, 63, served as a director of AmSurg from 2013 through the completion of the Merger. He has served as the Chairman of the Board and Chief Executive Officer of Acadia Healthcare Company, Inc., a behavioral healthcare company, since 2011. Prior to 2011, Mr. Jacobs co-founded Psychiatric Solutions, Inc. ("PSI") and served as Chairman, President and Chief Executive Officer of PSI from April 1997 until November 2010. Prior to founding PSI, Mr. Jacobs served for 21 years in various capacities with HCA, including as President of the Tennessee Division and as President of the Central Group. Mr. Jacobs has served

> on the Board of directors of Cumberland Pharmaceuticals, Inc., a specialty pharmaceutical company, since 2011.
>
> Mr. Jacobs has worked for over 35 years in the healthcare industry, including as a senior executive and chief executive officer of a publicly traded healthcare company. He has executive experience in finance and accounting, management, operations and strategic planning. Accordingly, we believe Mr. Jacobs is qualified to serve on our Board.

**<u>Defendant Lavender</u>**

52. Defendant Kevin P. Lavender ("Lavender") has served as a Company director since 2016. According to the 2017 Proxy Statement, on March 29, 2017, Defendant Lavender beneficially owned 12,180 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Lavender owned about $759,788 million worth of Envision stock.

53. For the fiscal year ended March 31, 2017, Defendant Lavender received $283,250 in compensation from the Company. This included $96,250 in fees earned, $145,000 in stock awards, and $42,000 in all other compensation.

54. The Company's 2017 Proxy Statement stated the following about Defendant Lavender:

> Mr. Lavender, 55, served as a director of AmSurg from 2004 through the completion of the Merger. Mr. Lavender has served as Executive Vice President and Head of Corporate Banking for Fifth Third Bank since February 2016. Prior to that, he served as Senior Vice President and Head of Corporate Banking for Fifth Third Bank from January 2014 through February 2016. From December 2005 through January 2014, Mr. Lavender held various senior banking positions at Fifth Third Bank. Mr. Lavender served as the Commissioner of the Tennessee Department of Financial Institutions from January 2003 to December 2005. In addition to his role as Commissioner, he served as the chairman of the National Regulatory Committee for the Conference of State Bank Supervisors and was a member of the Board of Directors. Prior to being named Commissioner, Mr. Lavender was co-founder and served as Executive Vice President of

> Administration and Banking for MediSphere Health Partners, Inc. from May 1996 to October 2002.
>
> We believe Mr. Lavender's extensive experience in the banking and finance industries, with a particular emphasis on corporate finance for healthcare companies, qualifies him to serve on our Board.

**Defendant Riggs**

55. Defendant Leonard M. Riggs, Jr. M.D. ("Riggs") has served as a Company director since 2016, and served as a director of Envision Holdings from August 2011 through completion of the Merger. He is also a member of the Compliance Committee. According to the 2017 Proxy Statement, on March 29, 2017, Defendant Riggs beneficially owned 54,414 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Riggs owned about $3.4 million worth of Envision stock.

56. For the fiscal year ended March 31, 2017, Defendant Riggs received $217,334 in compensation from the Company. This included $117,334 in fees earned and $100,000 in stock awards.

57. The Company's 2017 Proxy Statement stated the following about Defendant Riggs:

> Dr. Riggs, 74, served as a director of EHH from August 2011 through the completion of the Merger. Dr. Riggs was previously a director of the predecessor to EHH from July 2010 to May 2011. He is a private investor and serves as an Operating Partner of CIC Partners, a private equity firm based in Dallas, Texas, and as an affiliate partner of Lindsay Goldberg, a private equity firm based in New York. Dr. Riggs was a founder of EmCare, and also served as its Chairman and Chief Executive Officer until 2001. Dr. Riggs has served on numerous boards and is a former president of the American College of Emergency Physicians.

58. During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Riggs made the following sales of Company stock (and made no purchases of Company stock). On April 13, 2015, Defendant Riggs sold 4,000 shares of Company stock for $39.57 per share. On July 6, 2015, Defendant Riggs sold 4,000 shares of Company stock for $39.32 per share. On October 5, 2015, Defendant Riggs sold 4,000 shares of Company stock for $36.42 per share. Thus, in total, before the fraud was exposed, he sold 12,000 Company shares on inside information, for which he received approximately $460,520. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Deal**

59. Defendant James A. Deal ("Deal") has served as a Company director since 2016 and is the Chair of the Audit Committee. According to the 2017 Proxy Statement, on March 29, 2017, Defendant Deal beneficially owned 33,758 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Deal owned about $2.1 million worth of Envision stock.

60. For the fiscal year ended March 31, 2017, Defendant Deal received $293,958 in compensation from the Company. This included $73,958 in fees earned, $145,000 in stock awards, and $75,000 in all other compensation.

61. The Company's 2017 Proxy Statement stated the following about Defendant Deal:

> Mr. Deal, 67, served as a director of AmSurg from 1992 through November of 2016. He has served as President and Chief Executive Officer of Compassus, a

> provider of hospice care, since July 2006. During 2006, Mr. Deal served as Chairman of INSPIRIS, Inspired Care for the Frail Elderly, and from November 2001 to December 2005, Mr. Deal served as Chairman and Chief Executive Officer of INSPIRIS. From September 1998 to June 2001, Mr. Deal served as President, Chief Executive Officer and a director of Center for Diagnostic Imaging, Inc., a national network of outpatient diagnostic imaging centers. Mr. Deal served as Executive Vice President of Healthways, Inc., a disease management company, from January 1991 to August 1998, and as President of Diabetes Treatment Centers of America, Inc. (now American Healthways Services, Inc.), a Healthways subsidiary, from 1985 to August 1998.
>
> Mr. Deal has worked for over 40 years in the healthcare industry, including as a senior executive and chief executive officer of multi-site healthcare services companies. He has executive experience in finance and accounting, management, operations and strategic planning. Accordingly, we believe Mr. Deal is qualified to serve on our Board.

**Defendant Geringer**

62. Defendant Steven I. Geringer ("Geringer") has served as a Company director since 2016. According to the 2017 Proxy Statement, on March 29, 2017, Defendant Geringer beneficially owned 33,562 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Geringer owned about $2.1 million worth of Envision stock.

63. For the fiscal year ended March 31, 2017, Defendant Geringer received $362,500 in compensation from the Company. This included $167,500 in fees earned and $195,000 in stock awards.

64. The Company's 2017 Proxy Statement stated the following about Defendant Geringer:

> Mr. Geringer, 71, served as director of AmSurg from March 1997 through November 2016, and served as Chairman of the Board of AmSurg from July 2009 until November 2016. Mr. Geringer has served as Chairman of the Board of Addus HomeCare Corp., a provider of personal home care services, since January 2016 and as a director since 2009. Since 2015, he has served as a director of

> MedEquities Realty Trust, a healthcare REIT. From December 2012 until April 2015, Mr. Geringer served with Alvarez & Marsal, a global professional services firm, as a Managing Director responsible for Healthcare Private Equity Services, and served as a senior adviser during the following year. Mr. Geringer also serves as Chairman of Imedex, LLC, a privately held provider of continuing medical educational programs, and as a director of FastPace Urgent Medical, a privately held group of urgent care centers located in smaller communities. Until July 2014, Mr. Geringer served as Chairman of the Board of Qualifacts Systems, Inc., a provider of electronic health record systems designed for behavioral health, mental health, and human services organizations. In the last several years, Mr. Geringer has also served on the boards of various privately-held provider services healthcare companies.
>
> We believe that Mr. Geringer's extensive experience as a senior executive and investor in the healthcare industry enables him to make a significant contribution to our Board. He has executive experience in strategy planning, mergers and acquisitions, healthcare operations, and finance.

**Defendant Shelton**

65. Defendant James D. Shelton ("Shelton") has served as a Company director since 2016. He is also a member of the Compliance Committee. He was a director of Envision Holdings from July 2015 until the completion of the Merger, at which time he was a member of the Audit Committee. According to the 2017 Proxy Statement, on March 29, 2017, Defendant Shelton beneficially owned 3,911 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Shelton owned about $243,968 worth of Envision stock.

66. For the fiscal year ended March 31, 2017, Defendant Shelton received $215,000 in compensation from the Company. This included $57,625 in fees earned and $157,625 in stock awards.

67. The Company's 2017 Proxy Statement stated the following about Defendant Shelton:

> Mr. Shelton, 63, served as a director of EHH from July 2015 through the completion of the Merger. Mr. Shelton spent over 30 years working in the hospital industry. He founded Triad Hospitals in 1999 and served as Chairman and CEO of that company until it was sold in 2007. Prior to 1999, he served as an executive of HCA first as President of the Central Group and later as President of the Pacific Group. He also was an executive at National Medical Enterprises serving as the President of its Central Group. Since 2007 he has served on several public boards. In 2008 he joined the Board of Omnicare, Inc. He served as CEO of Omnicare during 2010 and served as Chairman of its board until it was sold in 2015. He is also a member of the Board of Ventas, Inc., where he serves as lead director.
>
> We believe that Mr. Shelton's over 30 years of executive, strategic and operational experience at Fortune 500 healthcare industry companies qualifies him to serve on our Board.

**Defendant Smith**

68. Defendant Michael L. Smith ("Smith") has served as a Company director since 2016, and is a member of the Audit Committee. He was a director of Envision Holdings from August 2011 through November 2016, served as lead director from April 2015 to November 2016, and was the Chair of the Audit Committee at the time of the Merger. According to the 2017 Proxy Statement, on March 29, 2017, Defendant Smith beneficially owned 19,105 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2017 was $62.38, Smith owned about $1.2 million worth of Envision stock.

69. For the fiscal year 2016, Defendant Smith received $297,750 in compensation from the Company. This included $197,750 in fees earned and $100,000 in stock awards.

70. The Company's 2017 Proxy Statement stated the following about Defendant Smith:

> Mr. Smith, 68, served as a director of EHH from August 2011 through November 2016, serving as lead director from April 2015 through November 2016, and

> previously was a director of its predecessor from July 2005 to May 2011. Mr. Smith is a private investor. He is a founding partner of Cardinal Equity Fund and Cardinal Equity Partners, a private investment firm focused on middle-market investments. From 1996 until his retirement in January 2005, Mr. Smith held executive positions with Anthem, Inc., and its predecessors and affiliates, including as Executive Vice President and Chief Financial and Accounting Officer from 2001 until January 2005. Mr. Smith also serves as a director of Vectren Corporation, a gas and electric power utility, and Carestream Health Services, Inc., a provider of healthcare imaging solutions. Mr. Smith is a member of the Board of Trustees of DePauw University.
>
> We believe that Mr. Smith's over 30 years of executive, strategic and financial experience in the healthcare industry qualifies him to serve on our Board.

**Defendant Schnall**

71. Defendant Richard J. Schnall ("Schnall") served as a Company director from 2016 until March 2017, and served on the Audit Committee. He was a director of Envision Holdings from May 2011 until the completion of the Merger.

72. For the fiscal year 2016, Defendant Schnall received $192,083 in compensation from the Company in the form of stock awards.

73. The Company's Schedule 14A filed with the SEC on March 23, 2016 (the "2016 Proxy Statement") stated the following about Defendant Schnall:

> Mr. Schnall became a director of the Company in May 2011. Mr. Schnall has been a financial partner at Clayton, Dubilier & Rice, LLC ("CD&R") since 2001 and has been with the firm since 1996. Prior to joining CD&R, he worked in the Investment Banking division of Donaldson, Lufkin & Jenrette, Inc. and Smith Barney & Co. Mr. Schnall is currently a director of U.S. Foods, David's Bridal, Inc. and Healogics, Inc., and formerly served on the boards of directors of AssuraMed, Inc., Sally Beauty Holdings, Inc., and PharMEDium Healthcare Corporation and Diversey, Inc. Mr. Schnall is a graduate of the Wharton School of Business at the University of Pennsylvania and holds an M.B.A. from Harvard Business School. We believe that Mr. Schnall's executive and financial experience qualifies him to serve on our board.

**Defendant Mactas**

74. Defendant Mark V. Mactas ("Mactas") served as director of Envision Holdings from 2013 until the completion of the Merger.

75. For the fiscal year 2016, Defendant Mactas received $208,167 in compensation from the Company. This included $108,167 in fees earned and $100,000 in stock awards.

76. The Company's 2016 Proxy Statement stated the following about Defendant Mactas:

> Mr. Mactas became a director of the Company in November 2013. From 2010 to 2011, Mr. Mactas served as Deputy Chairman, President and Chief Operating Officer of Towers Watson & Co., now Willis Towers Watson. From 2001 to 2010, Mr. Mactas was Chairman and Chief Executive Officer of Towers Perrin. He is currently the Vice Chairman of the board of trustees of Save The Children, where he has been a trustee since 2006. Mr. Mactas was president of the Conference of Consulting Actuaries and served on its board as well as that of the American Academy of Actuaries. Mr. Mactas currently serves as a director of Accolade, Inc., a consumer healthcare services provider, and sits on the board of trustees of Lehigh University, where he serves on the executive committee. He is a member of the American Academy of Actuaries and is a fellow of the Society of Actuaries and the Conference of Consulting Actuaries. He received a bachelor's degree in mathematics and economics from Lehigh University in 1974. We believe that Mr. Mactas's executive and business experience qualifies him to serve on our board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

77. By reason of their positions as officers, directors and/or fiduciaries of Envision and because of their ability to control the business and corporate affairs of Envision, the Individual Defendants owed Envision and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Envision in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Envision and its shareholders so as to benefit all shareholders equally.

78. Each director and officer of the Company owes to Envision and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

79. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Envision, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

80. To discharge their duties, the officers and directors of Envision were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

81. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Envision, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Envision's Board at all relevant times.

82. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the

NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. They also had a duty not to engage in the Healthcare Misconduct.

83. To discharge their duties, the officers and directors of Envision were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Envision were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to Envision's own internal guidelines, including its Code of Business Ethics and Conduct;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Envision conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Envision and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Envision's operations would comply with all laws and Envision's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

84. Each of the Individual Defendants further owed to Envision and the shareholders the duty of loyalty requiring that each favor Envision's interest and that of its shareholders over

their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

85. At all times relevant hereto, the Individual Defendants were the agents of each other and of Envision and were at all times acting within the course and scope of such agency.

86. Because of their advisory, executive, managerial, and directorial positions with Envision, each of the Individual Defendants had access to adverse, non-public information about the Company.

87. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Envision.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

88. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

89. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act; (ii) to engage in the Healthcare Misconduct; (iii) to conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iv) to artificially inflate the Company's stock price.

90. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Envision was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

91. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

92. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Envision, and was at all times acting within the course and scope of such agency.

## ENVISION'S CODE OF ETHICS

93. Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), the Code of Ethics is mandatory and applies to "all members of our workforce including temporary, part-time and full-time employees, independent contractors, clinicians, officers and directors of the Company and its subsidiaries and managed entities, as well as

consultants and contractors providing services for these entities all employees, officers, directors, contractors, consultants, and others working on our behalf."

94. The Code of Ethics provides, in the section titled "Following and Using the Code," that:

> Any violation of the Code may result in corrective action, up to and including termination. Colleagues who are aware of Code violations and fail to report the violations to the Company may also be subject to corrective action.
> A waiver of this Code for any executive officer or director may be made only by the Board of Directors or a committee of the Board of Directors and must be promptly disclosed to shareholders of Envision Healthcare in accordance with applicable law and New York Stock Exchange requirements.

95. The Code of Ethics provides, in the section titled "Submitting Accurate Claims for Services," that:

> We must submit appropriate and accurate claims to all patients and third party payors for medical services provided. The creation and submission of thorough and accurate information regarding the patient encounter is imperative to ensure we seek reimbursement only for those services that are medically necessary and actually performed, and we may not submit claims for services that are excessive or otherwise not legally reimbursable. We also must not submit false, fraudulent or misleading claims to any payor.

96. The Code of Ethics provides, in the section titled "Keeping Accurate Books, Records and Reports about the Company," that:

> We expect every colleague to take responsibility for the integrity of information that is included in business documents, whether that information is financial, operational, statistical, or other business data. You must not intentionally enter, record or report false, misleading or inaccurate information. It is the responsibility of the caregiver to ensure that our medical records are clear and complete and that they accurately reflect the care that was provided to a patient. Colleagues must not exaggerate or lead others to document events in an inappropriate way.

97. The Code of Ethics provides, in the section titled "Restricting Use of Inside Information," that:

> Under the Insider Trading Policy, Insiders, members of their immediate families, or any trusts over which the Insider has control, may not buy or sell Envision Healthcare securities or securities of any other publicly-held company, while in possession of Insider Information obtained during the course of employment. This prohibition applies even if the decision to buy or sell is not based on the Inside Information.

98. The Individual Defendants violated the Code of Ethics by making and/or causing the Company to make the false and misleading statements and/or omissions discussed herein and to violate applicable laws and regulations. Moreover, three of the Individual Defendants violated the Code of Ethics by engaging in insider trading.

99. Pursuant to the Company's Code of Ethics for the Executive Chairman, Chief Executive Officer and Senior Financial Officers of Envision Healthcare Corporation (the "Executive Code of Ethics"), the Company's Executive Officers (the Executive Chairman, CEO, CFO and other senior finical officers) are required to comply with the Executive Code of Ethics.

100. The Executive Code of Ethics provides, as to "Disclosures," that:

> When filing reports or submitting documents to the Securities and Exchange Commission, and in all other public communications, the Senior Financial Officers are expected to make disclosures which are full, fair, accurate, timely and understandable in all material respects.

101. The Executive Code of Ethics provides, as to "Compliance with Governmental Laws, Rules and Regulations," that "[i]t is the responsibility of the Chairman, CEO and Senior Financial Officers to abide by all laws, rules and regulations related to the Corporation."

102. Defendants Holden, Gulmi, Owen, and Sanger violated the Executive Code of Ethics by causing the Company to violate applicable laws and regulations and make false and misleading disclosures to the SEC.

## ENVISION'S AUDIT COMMITTEE CHARTER

103. Pursuant to its Charter, the Audit Committee will, *inter alia*:

Review any issues that arise with respect to the quality or integrity of the Corporation's financial statements.

* * *

Review and discuss with management and the Independent Auditor quarterly, unaudited financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," major underlying issues and the results of the Independent Auditor's review prior to filing each Form 10-Q (if any such filing is required), and determine whether such information should be distributed to the stockholders, bondholders or lenders.

* * *

Review and discuss with management and the Independent Auditor annual audited financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and major underlying issues, and recommend to the Board whether such audited financial statements should be distributed to the stockholders, bondholders and lenders, and included with the Corporation's Form 10-K, if applicable.

## ENVISION'S COMPLIANCE COMMITTEE CHARTER

104. Pursuant to the Company's Compliance Committee Charter, the purpose of the Compliance committee is "to assist the Board in fulfilling its oversight responsibilities relating

to," *inter alia*, "the Corporation's policies and procedures relating to the delivery of quality medical care to patients."

105. The responsibilities of the Compliance Committee include, *inter alia*, to "[r]egularly review reports of the General Counsel on pending or threatened litigation, any material reports or inquiries received by the Corporation from regulators or governmental agencies, and other matters, including the scope and effectiveness of compliance policies and programs," and "[r]eview, in conjunction with the Chief Medical Officer and other members of management, the development of internal systems and controls to collect and measure quality data and carry out the Corporation's standards, policies and procedures relating to quality of patient care and patient safety."

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

106. Envision Holdings, founded in 1992, has grown to become one of the largest providers of healthcare services in the U.S. Its portfolio of services includes physician services, ambulatory surgery services, post-acute care, and medical transportation.

107. EmCare, a subsidiary of Envision, provides physician practice management, employing 16,000 clinicians at over 4,600 facilities. Due to its scale, EmCare is uniquely positioned in the United States to provide hospitals with a single contractor for outsourcing clinical departments, providing services in the areas of emergency medicine, hospital medicine, acute care surgery, anesthesiology, and radiology.

108. AmSurg was a manager of physician practice-based ambulatory service centers and specialty physician networks.

109. Envision Holdings entered into a merger agreement with AmSurg on June 15, 2016, providing for the companies to merge in an all-stock transaction. The combined entity would be 53% owned by Envision Holdings shareholders and 47% owned by AmSurg shareholders.

110. The merger was completed on December 1, 2016, and the combined entity was renamed Envision Healthcare Corp. and headquartered in Nashville, Tennessee.

**A History of Misconduct**

111. The Company has a history of illegal billing and admissions practices that put or should have put the Individual Defendants on notice of the Healthcare Misconduct if not for their reckless or willful lack of oversight.

112. A whistleblower suit in the 1990's was brought against Emergency Physician Billing Services ("EPBS"), a medical billing services company then utilized by EmCare, for fraudulently pressuring coders to up-code.

113. A consolidated qui tam action is pending in the U.S. District Court for the District of Columbia (1:14-mc-00339-RBW) alleging violations of, *inter alia*, the Anti-Kickback Statute (42 U.S.C. § 1320a-7b) and False Claims Act (31 U.S.C. § 3729(a)(1)(A), (B) and (C)), arising from EmCare's practice of pressuring ER doctors to admit patients where it was medically unnecessary to do so. The USDOJ has intervened in that suit.

114. The qui tam action alleges, *inter alia*, that EmCare: (1) enforced corporate benchmarks for admissions, diagnostic testing, calls to primary care physicians, and admission overrides; (2) paid bonuses to physicians whose practices maximized hospital admissions; (3) trained physicians to sell primary care physicians on hospital admissions, instead of engaging in

a meaningful consultation; (4) directed physicians to admit more patients and follow excessive testing protocols; (5) terminated physicians who refused to treat patients in a manner that boosted EmCare's bottom line, but rather engaged in medical treatment using their independent judgment as to the medical needs of patients; and (6) terminated corporate managers who refused to follow corporate directives to increase admissions.

**The Healthcare Misconduct**

115. The Individual Defendants caused Envision to engage in an illegal scheme to increase revenues and inflate the Company's stock price by billing for complex, expensive medical care where such care was medically unwarranted; admitting emergency room patients into hospitals for financial reasons when such admission was not medically necessary; and engaging in a practice known as "surprise billing," whereby patients seeking treatment at in-network facilities were treated by out-of-network physicians, causing those patients to be billed at higher rates. This conduct has subjected the Company to an investigation by U.S. Senator Claire McCaskill.

116. Researchers from Yale University have found that when EmCare becomes involved in a hospital, there is a marked and immediate increase in instances where ER patients who seek care at an in-network hospital are nonetheless treated by out-of-network doctors, resulting in higher costs for patients and insurers.

117. The Yale researchers also found that when EmCare enters a hospital, there is an increase in hospital admissions from the ER, which increases the revenue hospitals see from those patients.

118. The Yale researchers also found that when EmCare enters a hospital, there is an increased utilization of the highest-level billing codes, which again results in increased revenues for the hospitals.

**Materially False and Misleading Statements**

119. The Individual Defendants made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, prospects, and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make the following false and misleading statements that failed to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls.

***2014 10-K***

120. On March 2, 2015, the Envision Holdings filed its annual report with the SEC announcing financial results for the quarter and year ended December 31, 2014 on Form 10-K (the "2014 10-K"). For the quarter, Envision Holdings reported net income of $49.9 million, or $0.26 per diluted share, on income of $1.16 billion, compared to net income of $7.9 million, or $0.04 per diluted share, on revenue of $984.8 million for the same period in the prior year. For 2014, Envision reported net income of $125.5 million, or $0.66 per diluted share, on revenue of

$7.9 billion compared to net income of $6 million, or $0.04 per diluted share, on revenue of $6.8 billion in 2013.

121. In relevant part, the 2014 10-K stated:

> We intend to enhance our leading market positions by implementing the following key elements of our business strategy:
>
> **Capitalize on Organic Growth Opportunities.** Our scale and scope, leading market positions and long operating history combined with our value-enhancing initiatives, provide us with competitive advantages to continue to grow our business. We intend to gain market share from local, regional and national competitors as well as through continued outsourcing of clinical services by healthcare facilities, communities and payors. ***We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs. We believe these factors have driven EmCare's strong track record in obtaining new contracts and retaining existing customers.*** At AMR, we believe market share gains will be driven by our strong clinical expertise, high-quality service, strong brand recognition and advanced information technology capabilities. In particular, our proprietary clinical database of patient transports, including detailed tracking of mortality rates and resuscitation metrics, provides analytical support to AMR's differentiated clinical results and has been a key factor in obtaining new contracts. We anticipate driving significant organic growth in Evolution Health by adding new contracts to meet the demand for physician-led care management solutions outside the hospital.

(Bold heading in original. Bold & italic emphasis added.)

122. The 2014 10-K continued, noting further growth opportunities from selling additional services to existing customers:

> **Grow Complementary and Integrated Service Lines.** Our continued focus on cross-selling and offering integrated services across the patient continuum has helped hospital systems, communities and payors to realize economic benefits and clinical value for patients. We continue to enter complementary service lines at both EmCare and AMR that leverage our core competencies. At EmCare, we continue to expand and integrate our ED, anesthesiology, hospitalist, post-hospital, radiology, tele-radiology and surgery services. Our ability to cross-sell EmCare services is enhanced by our national and regional contracts that provide preferred access to certain healthcare facilities throughout the United States. In addition, our Complete Care package, which is an integrated offering of ED and hospitalist services in primarily rural communities, has been one of our most

> successful recent growth initiatives. ***These factors, among others, have increased the percentage of healthcare facilities utilizing multiple EmCare service lines from 11% in 2009 to 24% in 2014.*** At AMR, we have expanded service lines, such as our managed transportation operations, fixed-wing air transportation services and community paramedic programs, with both new and existing customers. We expect Evolution Health to be a catalyst for cross-selling our services across all of our businesses and not just within a particular segment or service line.

(Bold heading in original. Bold & italic emphasis added.)

123. The 2014 10-K was signed by Defendants Sanger, Owen, Williams, Burt, Riggs, Schnall, Smith, and Mactas.

124. Attached to the 2014 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Sanger and Owen attesting to the accuracy of the 2014 10-K.

***2015 Proxy Statement***

125. On April 22, 2015, the Envision Holdings filed its 2015 Proxy Statement with the SEC. The 2015 Proxy Statement failed to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls.

126. The 2015 Proxy Statement was also false and misleading in stating that the Code of Ethics "applies to all of the Company's officers, employees and directors" in light of the

violations of the Code of Ethics engaged in by the individual defendants, including through the false and misleading statements and insider trades discussed herein.

127. The 2015 Proxy Statement was also false and misleading in stating that the its Executive Code of Ethics "applies to our Chief Executive Officer, Chief Financial Officer, corporate officers with financial and accounting responsibilities," in light of violations of the Executive Code of Ethics by Defendants Sanger, Gulmi and Owen.

***Q1 2015 10-Q***

128. On May 8, 2015, Envision Holdings filed a quarterly report for the fiscal quarter ended March 31, 2015 on Form 10-Q (the "Q1 2015 10-Q"). For the quarter, Envision Holdings reported net income of $33.4 million, or $0.17 per diluted share, on revenue of $2.25 billion, compared to net income of $21.5 million, or $0.13 per diluted share, on revenue of $1.86 billion for the same period in the prior year.

129. The Q1 2015 10-Q summarized EmCare's financial performance, stating, in relevant part:

> **EmCare**
>
> Of EmCare's net revenue for the three months ended March 31, 2015, approximately 76% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 5% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and 1% from other hospital management services. Approximately 84% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 16% was generated from billings to hospitals and affiliated physician groups for professional services.

130. The Q1 2015 10-Q was signed by Defendants Sanger and Owen.

131. Attached to the Q1 2015 10-Q were SOX certifications signed by Defendants Sanger and Owen, attesting to the accuracy of the Q1 2015 10-Q.

***Q2 2015 10-Q***

132. On August 3, 2015, Envision Holdings filed a quarterly report for the fiscal quarter ended June 30, 2015 on Form 10-Q (the "Q2 2015 10-Q"). For the quarter, Envision Holdings reported net income of $52.4 million, or $0.27 per diluted share, on revenue of $2.42 billion, compared to net loss of $2 million, or $0.01 per diluted share, on revenue of $1.95 billion for the same period in the prior year.

133. Q2 2015 10-Q summarized EmCare's financial performance, stating, in relevant part:

> **EmCare**
>
> Of EmCare's net revenue for the six months ended June 30, 2015, approximately 76% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 6% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services. Approximately 84% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 16% was generated from billings to hospitals and affiliated physician groups for professional services.

134. The Q2 2015 10-Q was signed by Defendants Sanger and Owen.

135. Attached to the Q2 2015 10-Q were SOX certifications signed by Defendants Sanger and Owen, attesting to the accuracy of the Q2 2015 10-Q.

***Q3 2015 10-Q***

136. On November 3, 2015, Envision Holdings filed a quarterly report for the fiscal quarter ended September 30, 2015 on Form 10-Q (the "Q3 2015 10-Q"). For the quarter,

Envision Holdings reported net income of $17.2 million, or $0.09 per diluted share, on revenue of $2.48 billion, compared to net income of $52.8 million, or $0.28 per diluted share, on revenue of $1.99 billion for the same period in the prior year.

137. Q3 2015 10-Q summarized EmCare's financial performance, stating, in relevant part:

> **EmCare**
>
> Of EmCare's net revenue for the nine months ended September 30, 2015, approximately 74% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 6% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and 2% from other hospital management services. Approximately 83% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 17% was generated from billings to hospitals and affiliated physician groups for professional services.

138. The Q3 2015 10-Q was signed by Defendants Sanger and Owen.

139. Attached to the Q3 2015 10-Q were SOX certifications signed by Defendants Sanger and Owen, attesting to the accuracy of the Q3 2015 10-Q.

***2015 10-K***

140. On February 29, 2016, the Envision Holdings filed its annual report with the SEC announcing financial results for the quarter and year ended December 31, 2015 on Form 10-K (the "2015 10-K"). For the quarter, Envision Holdings reported net income of $41.9 million, or $0.22 per diluted share, compared to net income of $49.9 million, or $0.26 per diluted share, on income of $1.16 billion for the same period in the prior year. For 2015, Envision reported net income of $144.9 million, or $0.76 per diluted share, on revenue of $9.9 billion compared to net income of $125.5 million, or $0.66 per diluted share, on revenue of $7.9 billion in 2014.

141. In relevant part, the 2015 10-K stated:

> We intend to enhance our leading market positions by implementing the following key elements of our business strategy:
> ***Capitalize on Organic Growth Opportunities.*** Our scale and scope, leading market positions and long operating history combined with our value-enhancing initiatives, provide us with competitive advantages to continue to grow our business. We intend to gain market share from local, regional and national competitors as well as through continued outsourcing of clinical services by healthcare facilities, communities and payors. **We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs. We believe these factors have driven EmCare's strong track record in obtaining new contracts and retaining existing customers.** At AMR, we believe market share gains will be driven by our strong clinical expertise, high-quality service, strong brand recognition and advanced information technology capabilities. In particular, our proprietary clinical database of patient transports, including detailed tracking of mortality rates and resuscitation metrics, provides analytical support to AMR's differentiated clinical results and has been a key factor in obtaining new contracts. We anticipate driving significant organic growth in Evolution Health by adding new contracts to meet the demand for physician-led care management solutions outside the hospital.

(Bold & italic heading in original. Bold emphasis added.)

142. The 2015 10-K continued, noting further growth opportunities from selling additional services to existing customers:

> ***Grow Complementary and Integrated Service Lines.*** Our continued focus on cross-selling and offering integrated services across the patient continuum has helped hospital systems, communities and payors to realize economic benefits and clinical value for patients. We continue to enter complementary service lines at both EmCare and AMR that leverage our core competencies. At EmCare, we continue to expand and integrate our ED, anesthesiology, hospitalist, post-hospital, radiology, tele-radiology and surgery services. Our ability to cross-sell EmCare services is enhanced by our national and regional contracts that provide preferred access to certain healthcare facilities throughout the United States. In addition, our Complete Care package, which is an integrated offering of ED and hospitalist services in primarily rural communities, has been one of our most successful recent growth initiatives. **These factors, among others, have increased the percentage of healthcare facilities utilizing multiple EmCare service lines from 11% in 2010 to 22% in 2015.** At AMR, we have expanded service lines, such as our managed transportation operations, fixed-wing air

> transportation services and community paramedic programs, with both new and existing customers. We expect Evolution Health to be a catalyst for cross-selling our services across all of our businesses and not just within a particular segment or service line.

(Bold & italic heading in original. Bold emphasis added.)

143. The 2015 10-K was signed by Defendants Sanger, Owen, Burt, Mactas, Riggs, Shcnall, Shelton, Smith and Williams.

144. Attached to the 2015 10-K were SOX certifications signed by Defendants Sanger and Owen, attesting to the accuracy of the 2015 10-K.

***2016 Proxy Statement***

145. On March 23, 2016, the Envision Holdings filed its 2016 Proxy Statement with the SEC. The 2016 Proxy Statement failed to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls.

146. The 2016 Proxy Statement was also false and misleading in stating that the Code of Ethics "applies to all of the Company's officers, employees and directors" in light of the violations of the Code of Ethics engaged in by the individual defendants, including through the false and misleading statements and insider trades discussed herein.

147. The 2016 Proxy Statement was also false and misleading in stating that the its Executive Code of Ethics "applies to our Chief Executive Officer, Chief Financial Officer,

corporate officers with financial and accounting responsibilities," in light of violations of the Executive Code of Ethics by Defendants Sanger, Gulmi and Owen.

***Q1 2016 10-Q***

148. On May 6, 2016, Envision Holdings filed a quarterly report for the fiscal quarter ended March 31, 2016 on Form 10-Q (the "Q1 2016 10-Q"). For the quarter, Envision Holdings reported net income of $30.4 million, or $0.14 per diluted share, on revenue of $2.86 billion compared to net income of $33.4 million, or $0.17 per diluted share, on revenue of $2.25 billion for the same period in the prior year.

149. The Q1 2016 10-Q summarized EmCare's financial performance, stating, in relevant part:

> **EmCare**
>
> Of EmCare's net revenue for the three months ended March 31, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 12% from our hospitalist/inpatient services, 11% from our post-acute care services, 6% from contracts related to anesthesiology services, 4% from our locum tenens services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services. Approximately 79% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 21% was generated from billings to hospitals and affiliated physician groups for professional services.

150. The Q1 2016 10-Q was signed by Defendants Sanger and Owen.

151. Attached to the Q1 2016 10-Q were SOX certifications signed by Defendants Sanger and Owen, attesting to the accuracy of the Q1 2016 10-Q.

***Q2 2016 10-Q***

152. On August 3, 2016, Envision Holdings filed a quarterly report for the fiscal quarter ended June 30, 2016 on Form 10-Q (the "Q2 2016 10-Q"). For the quarter, Envision

Holdings reported net income of $28.4 million, or $0.15 per diluted share, on revenue of $2.88 billion compared to net income of $52.4 million, or $0.27 per diluted share, on revenue of $2.42 billion for same period in the prior year.

153. Q2 2016 10-Q summarized EmCare's financial performance, stating, in relevant part:

> **EmCare**
>
> Of EmCare's net revenue for the six months ended June 30, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 12% from our hospitalist/inpatient services, 11% from our post-acute care services, 6% from contracts related to anesthesiology services, 4% from our locum tenens services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services. Approximately 79% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 21% was generated from billings to hospitals and affiliated physician groups for professional services.

154. The Q2 2016 10-Q was signed by Defendants Sanger and Owen.

155. Attached to the Q2 2016 10-Q were SOX certifications signed by Defendants Sanger and Owen, attesting to the accuracy of the Q2 2016 10-Q.

***Q3 2016 10-Q***

156. On November 3, 2016, Envision Holdings filed a quarterly report for the fiscal quarter ended September 30, 2016 on Form 10-Q (the "Q3 2016 10-Q"). For the quarter, Envision Holdings reported net income of $25.9 million, or $0.13 per diluted share, on revenue of $2.92 billion, compared to net income of $17.2 million, or $0.09 per diluted share, on revenue of $2.48 billion for the same period in the prior year.

157. Q3 2016 10-Q summarized EmCare's financial performance, stating, in relevant part:

**EmCare**

> Of EmCare's net revenue for the nine months ended September 30, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 11% from our hospitalist/inpatient services, 11% from our post-acute care services, 6% from contracts related to anesthesiology services, 4% from our locum tenens services, 2% from our surgery services, 1% from our radiology/tele-radiology services, and less than 1% from other hospital management services. Approximately 80% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 20% was generated from billings to hospitals and affiliated physician groups for professional services.

158. The Q3 2016 10-Q was signed by Defendants Sanger and Owen.

159. Attached to the Q3 2016 10-Q were SOX certifications signed by Defendants Sanger and Owen, attesting to the accuracy of the Q3 2016 10-Q.

***2016 10-K***

160. On March 1, 2017, the Envision filed its annual report with the SEC announcing financial results for the quarter and year ended December 31, 2016 on Form 10-K (the "2015 10-K"). For the quarter, Envision reported a net loss of $137.8 million, or $1.84 per diluted share, on income of $1.39 billion, compared to net income of $63.3 million, or $1.24 per diluted share, on income of $704.3 million for the same period in the prior year. For 2016, Envision reported a net loss of $18.6 million, or $0.47 per diluted share, on revenue of $3.7 billion compared to net income of $163 million, or $3.16 per diluted share, on revenue of $2.57 billion in 2014.

161. The 2016 10-K was signed by Defendants Holder, Gulmi, Sanger, Burt, Deal, Gawaluck, Geringer, Jacobs, Lavender, Miller, Riggs, Shcnall, Shelton, Smith and Williams.

162. Attached to the 2016 10-K were SOX certifications signed by Defendants Holden and Gulmi, attesting to the accuracy of the 2016 10-K.

***2017 Proxy Statement***

163. On April 13, 2017, the Company filed its 2017 Proxy Statement with the SEC. The 2017 Proxy Statement failed to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls.

164. The 2017 Proxy Statement was also false and misleading in stating that the Code of Ethics "applies to directors as well as employees" in light of the violations of the Code of Ethics engaged in by the individual defendants, including through the false and misleading statements and insider trades discussed herein.

165. The 2017 Proxy Statement was also false and misleading in stating that the its "Chief Executive Officer and other executive officers are bound by all provisions of the [Executive] Code of Ethics," in light of violations of the Executive Code of Ethics by Defendants Holden, Sanger, Gulmi and Owen.

***Q1 2017 10-Q***

166. On May 5, 2017, Envision filed a quarterly report for the fiscal quarter ended March 31, 2017 on Form 10-Q (the "Q1 2017 10-Q"). For the quarter, Envision reported a net loss of $445.2 million, or $3.84 per diluted share, on revenue of $1.88 billion compared to net income of $30.9 million, or $0.53 per diluted share, on revenue of $724.7 million for the same period in the prior year.

167. The Q3 2016 10-Q was signed by Defendant Gulmi.

168. Attached to the Q1 2017 10-Q were SOX certifications signed by Defendants Holden and Gulmi, attesting to the accuracy of the Q1 2017 10-Q.

169. The statements in ¶¶ 120-168 were materially false and misleading because they made misleading statements that failed to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls.

## **The Truth Emerges**

### ***The New York Times Article***

170. On July 24, 2017, *The New York Times* published an article titled "The Company Behind Many Surprise Emergency Room Bills" (the "Times Article").

171. The Times Article reported that hospitals at which EmCare operates display disproportionately high rates of "surprise billing," a process whereby patients who visit in-network hospitals are treated by out-of-network physicians, resulting in higher billing rates.

172. The following charts demonstrate the relationship between EmCare and surprise billing as uncovered by a Yale University study (the "Yale Study"). The purple line represents the percent of in-network ER visits billed as out of network, and the vertical white line at the

center of each graph denotes when EmCare took over the emergency department for each respective hospital.[3]




173. Zack Cooper, one of the study's authors, described the trend as looking "like a light switch was being flipped on."

174. The following chart reflects the trends observed by the Yale Study at eight hospitals where out of network bills were not already near 100% when EmCare took over:[4]

[3] Reprinted from *The New York Times*.
[4] Reprinted from *The New York Times*, original source Zack Cooper, Fiona Scott Morton and Nathan Shekita, Yale University.




175. The Yale Study found that surprise billing is a concentrated practice: "[a]t about 15 percent of hospitals, out-of-network rates were over 80 percent." Many of the hospitals in that 15 percent were run by EmCare.

176. In addition, the Yale Study found that after EmCare began working at a hospital, hospital admissions increased, as did the rate at which the highest-level billing codes were used. The following charts demonstrate the such trends at 16 hospitals:[5]




[5] Reprinted from *The New York Times*, original source Zack Cooper, Fiona Scott Morton and Nathan Shekita, Yale University.




177. In response to the Times Article, the Company's share price dropped $2.33, or 3.7%, to close at $60.28 on July 24, 2017. The Company's share price continued to decline since the article was published, closing below $25 per share on several days.

***September 19, 2017 Form 8-K***

178. On September 19, 2017, the Company announced the departure of its CFO, Claire Gulmi; the departure of the President of its Physician Services Group; and the creation of a new Chief Operating Officer position in a Form 8-K filed with the SEC.

179. On this news, the Company's share price dropped $4.56, or 9.5%, to close at $43.11 on September 19, 2017.

**<u>Repurchases</u>**

180. During the period in which the Company made false and misleading statements and/or omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. As the Company stock was actually only worth $43.11 per share, the price at which it was trading on September 19, 2017,[6] the Company overpaid approximately $3.4 million in total for these repurchases.

[6] September 19, 2017 was the first trading day following the Company's announcement that Defendant Gulmi had

181. According to the Company's Form 10-Q filed with the SEC on May 5, 2017, in the quarter ended March 31, 2017, the Individual Defendants caused the Company to repurchase 128,186 shares of its own common stock at an average price per share of approximately $68.53, for a total cost to the Company of approximately $8.8 million.[7]

182. Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $25.42 more than the actual worth of each share during the quarter ended March 31, 2017. Thus, the total over payment by the Company for its repurchases of its own stock during the quarter ended March 31, 2017 was approximately $3.3 million.

183. According to the Company's Form 10-Q filed with the SEC on August 8, 2017, in the quarter ended June 30, 2017, the Individual Defendants caused the Company to repurchase 1,974 shares of its own common stock at an average price per share of approximately $56.26, for a total cost to the Company of approximately $111,057.

184. Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $13.15 more than the actual worth of each share during the quarter ended June 30, 2017. Thus, the total over payment by the Company for its repurchases of its own stock during the quarter ended June 30, 2017 was approximately $25,958.

185. According to the Company's Form 10-Q filed with the SEC on November 3, 2017, in the month ended August 31, 2017, the Individual Defendants caused the Company to

departed as CEO and the Company had created a new Chief Operating Officer position.

[7] All of the repurchases made during 2017 were "to cover payroll withholding taxes in connection with the vesting of restricted stock awards under the Envision Healthcare Corporation 2014 Equity and Incentive Plan."

repurchase 5,244 shares of its own common stock at an average price per share of approximately $61.77, for a total cost to the Company of approximately $323,922.

186. Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $18.66 more than the actual worth of each share during the month ended August 31, 2017. Thus, the total over payment by the Company for its repurchases of its own stock during the month ended August 31, 2017 was approximately $97,853.

187. In total, the Company overpaid an aggregate amount of approximately $3.4 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

**Summary of Individual Defendants' Misconduct**

188. In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls.

189. Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct the foregoing false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

190. The Individual Defendants also breached their fiduciary duties by causing the Company to engage in the Healthcare Misconduct.

191. Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, the Individual Defendants caused the Company to overpay for repurchases of Company stock and three of the Individual Defendants benefitted themselves by engaging in insider sales.

192. In further breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

**DAMAGES TO ENVISION**

193. As a direct and proximate result of the Individual Defendants' conduct, Envision will lose and expend many millions of dollars.

194. Such losses include the Company's overpayment by approximately $3.4 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

195. Such expenditures include, but are not limited to, legal fees associated with the Consolidated Securities Class Action filed against the Company and eleven of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

196. Such losses include, but are not limited to, those incurred and to be incurred by the Company in responding to the investigation into the Company by Senator McCaskill.

197. Such costs include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

198. As a direct and proximate result of the Individual Defendants' conduct, Envision has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

199. Plaintiff brings this action derivatively and for the benefit of Envision to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Envision, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

200. Envision is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

201. Plaintiff is, and has been at all relevant times, an Envision shareholder. Plaintiff will adequately and fairly represent the interests of Envision in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

202. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

203. A pre-suit demand on the Board of Envision is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following 12 Individual Defendants: Sanger, Holden, Burt, Miller, Smith, Gawaluck, Jacobs, Lavender, Riggs, Deal, Geringer, and Shelton (collectively, the "Directors"). Plaintiff only needs to allege demand futility as to six of the 12 Directors who are on the Board at the time this action is commenced.

204. Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to engage in the Healthcare Misconduct and to make and/or cause the Company to make the false and misleading statements and omissions of material fact while two of them engaged in insider sales based on material non-public information netting proceeds of over $32 million and at the same time caused the Company to overpay $3.4 million for repurchases of its own stock, which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

205. In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the Healthcare Misconduct and making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants, three of the Individual Defendants, including two of the Company's Directors, collectively sold over $39 million worth of Company stock at artificially inflated prices based on inside material information.

206. In further abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in and/or caused the Company to engage in the Healthcare Misconduct.

207. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

208. Additional reasons that demand on Defendant Sanger is futile follow. Defendant Sanger was the Executive Chairman of the Board (until December 1, 2017 when he became the non-executive Chairman), and previously served as Envision Holdings' President and CEO from May 2011 to November 2016, and is thus, as the Company admits, has been a non-independent director during the Relevant Period. Indeed, the Company compensated him with over $6.9 million in 2016. Defendant Sanger's large Company stock holding, worth over $15.6 million on March 29, 2017, reveals his interest in keeping the Company's stock price as high as possible. Defendant Sanger was ultimately responsible for the false and misleading statements and omissions that were made, including those contained in the SEC filings referenced herein, many of which he signed and personally made. Additionally, he is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls. His insider sales before the fraud was exposed, which yielded approximately $31.6 million in proceeds, demonstrate his

motive in facilitating and participating in the fraud. Furthermore, Defendant Sanger is a defendant in the Consolidated Securities Class Action. Finally, as Executive Chairman of the Board, Defendant Sanger conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Healthcare Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Sanger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209. Additional reasons that demand on Defendant Holden is futile follow. Defendant Holden is the Company's Chief Executive Officer, and is thus, as the Company admits, a non-independent director. Indeed, the Company compensated him with over $21.7 million in 2016. Defendant Holden's large Company stock holding, worth over $34.7 million on March 29, 2017, reveals his interest in keeping the Company's stock price as high as possible. Defendant Holden was ultimately responsible for the false and misleading statements and omissions that were made, including those contained in the SEC filings referenced herein, many of which he signed and personally made. Additionally, he is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5)

the Company failed to maintain internal controls. Furthermore, Defendant Holden is a defendant in the Consolidated Securities Class Action. Finally, Defendant Holden conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Healthcare Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Holden breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

210. Additional reasons that demand on Defendant Riggs is futile follow. Defendant Riggs has served as a Company director since 2016, and was a Director of Envision Holdings from 2011 until the completion of the Merger. He is a member of the Compliance Committee. He was compensated with $217,334 in 2016, and so lacks independence. Defendant Riggs' large Company stock holding, worth approximately $3.4 million on March 29, 2017, reveals his interest in keeping the Company's stock price as high as possible. As a long-time director and member of the Compliance Committee, Defendant Riggs conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Healthcare Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2014 10-K, 2015 10-K & 2016 10-K that are referenced herein. He is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or

maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls. Furthermore, Defendant Riggs is a defendant in the Consolidated Securities Class Action. His insider sales before the fraud was exposed, which yielded approximately $460,520 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Thus, for these reasons, too, Defendant Riggs breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

211. Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since 2016, and was a Director of Envision Holdings from 2011 through November 2016, and served as lead director from April 2015 to November 2016. He was compensated with $297,750 in 2016, and so lacks independence. Defendant Smith's large Company stock holding, worth approximately $1.2 million on March 29, 2017, reveals his interest in keeping the Company's stock price as high as possible. As a long-time director, Defendant Smith conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Healthcare Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2014 10-K, 2015 10-K & 2016 10-K that are referenced herein. He is liable for causing the Company

to fail to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls. Furthermore, Defendant Smith is a defendant in the Consolidated Securities Class Action. Thus, for these reasons, too, Defendant Smith breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212. Additional reasons that demand on Defendant Burt is futile follow. Defendant Burt has served as a Company director since 2016, was a Director of Envision Holdings from 2011 until the completion of the Merger, and is a member of the Audit Committee. Defendant Burt was compensated with $223,750 in 2016, and so lacks independence. Defendant Burt's large Company stock holding, worth approximately $1.3 million on March 29, 2017, reveals her interest in keeping the Company's stock price as high as possible. As a long-time director and member of the Audit Committee, Defendant Burt conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Healthcare Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, she signed, and thus personally made, the false and misleading statements in the 2014 10-K, 2015 10-K & 2016 10-K that are referenced herein. She is liable for causing the Company to fail to disclose that: (1) the Company engaged in the

Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls. Furthermore, Defendant Burt is a defendant in the Consolidated Securities Class Action. Thus, for these reasons, too, Defendant Burt breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

213. Additional reasons that demand on Defendant Shelton is futile follow. Defendant Shelton has served as a Company director since 2016, and was a director of Envision Holdings from July 2015 until the completion of the Merger, at which time he was a member of the Audit Committee. He is a member of the Compliance Committee. He was compensated with $215,000 in 2016, and so lacks independence. Defendant Shelton's large Company stock holding, worth approximately $243,968 on March 29, 2017, reveals his interest in keeping the Company's stock price as high as possible. As a director and member of the Audit Committee during part of the Relevant Period, and a current member of the Compliance Committee, Defendant Shelton conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Healthcare Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2015 10-K & 2016 10-K that are

referenced herein. He is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls. Furthermore, Defendant Shelton is a defendant in the Consolidated Securities Class Action. Thus, for these reasons, too, Defendant Shelton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

214. Additional reasons that demand on Defendant Deal is futile follow. Defendant Deal has served as a Company director since 2016, and is Chair of the Audit Committee. He was compensated with $293,958 in 2016, and so lacks independence. Defendant Deal's large Company stock holding, worth approximately $2.1 million on March 29, 2017, reveals his interest in keeping the Company's stock price as high as possible. As Chair of the Audit Committee, Defendant Deal conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Healthcare Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that is referenced herein. He is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability

were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls. Thus, for these reasons, too, Defendant Deal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

215. Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since 2016, and is a member of the Audit Committee and Chair of the Compliance Committee. She was compensated with $285,833 in 2016, and so lacks independence. Defendant Miller's large Company stock holding, worth over $1 million on March 29, 2017, reveals her interest in keeping the Company's stock price as high as possible. As a director, Chair of the Compliance Committee, and member of the Audit Committee, Defendant Miller conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Healthcare Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, she signed, and thus personally made, the false and misleading statements in the 2016 10-K that is referenced herein. She is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing

conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls. Thus, for these reasons, too, Defendant Miller breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

216. Additional reasons that demand on Defendant Gawaluck is futile follow. Defendant Gawaluck has served as a Company director since 2016, an is a member of the Audit Committee and the Compliance Committee. He was compensated with $262,500 in 2016, and so lacks independence. Defendant Gawaluck's large Company stock holding, worth approximately $379,270 on March 29, 2017, reveals his interest in keeping the Company's stock price as high as possible. As a director and member of the Audit Committee, Defendant Gawaluck conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Healthcare Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that is referenced herein. He is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal

controls. Thus, for these reasons, too, Defendant Gawaluck breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

217. Additional reasons that demand on Defendant Geringer is futile follow. Defendant Geringer has served as a Company director since 2016. He was compensated with $362,500 in 2016, and so lacks independence. Defendant Geringer's large Company stock holding, worth approximately $2.1 million on March 29, 2017, reveals his interest in keeping the Company's stock price as high as possible. Defendant Geringer conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Healthcare Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that is referenced herein. He is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls. Thus, for these reasons, too, Defendant Geringer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218. Additional reasons that demand on Defendant Lavender is futile follow. Defendant Lavender has served as a Company director since 2016. He was compensated with $283,250 in 2016, and so lacks independence. Defendant Lavender's large Company stock holding, worth approximately $759,788 million on March 29, 2017, reveals his interest in keeping the Company's stock price as high as possible. As a director, Defendant Lavender conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Healthcare Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that are referenced herein. He is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls. Thus, for these reasons, too, Defendant Lavender breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219. Additional reasons that demand on Defendant Jacobs is futile follow. Defendant Jacobs has served as a Company director since 2016. He was compensated with $250,417 in 2016, and so lacks independence. Defendant Jacobs's large Company stock holding, worth

approximately $644,447 on March 29, 2017, reveals his interest in keeping the Company's stock price as high as possible. As a director, Defendant Jacobs conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Healthcare Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that is referenced herein. He is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls. Thus, for these reasons, too, Defendant Jacobs breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220. Additional reasons that demand on the Board is futile follow.

221. Demand in this case is excused because the Directors, all of whom are named as defendants in this action, and six of whom are defendants in the Consolidated Securities Class Action,[8] control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude

[8] Specifically, the Consolidated Securities Class Action names Directors Sanger, Holden, Smith, Burt, Shelton, and Riggs as defendants.

them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

222. As described above, two of the Directors on the Board directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics. Defendants Sanger and Riggs received proceeds in excess of $32 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

223. Additionally, each one of the Directors, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $3.4 million for its own common stock during the period in which the false and misleading statements were made. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

224. Envision has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for

Envision any part of the damages Envision suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

225. The Individual Defendants' conduct described herein and summarized above, including the decision for the Company to engage in the repurchases of its own stock, could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

226. The acts complained of herein constitute violations of fiduciary duties owed by Envision's officers and directors, and these acts are incapable of ratification.

227. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Envision. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Envision, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand,

if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

228. If there is no directors' and officers' liability insurance, then the Directors will not cause Envision to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

229. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least six of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934

230. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

231. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

232. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

233. Under the direction and watch of the Directors, the 2015, 2016, and 2017 Proxy Statements failed to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls.

234. The 2015, 2016, and 2017 Proxy Statements were also false and misleading in stating that the Code of Ethics applied to all directors and employees, in light of the violations of the Code of Ethics engaged in by the Individual Defendants, including through the false and misleading statements and insider trades discussed herein.

235. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting and failing to disclose the foregoing material facts, the statements contained in the 2015, 2016, and 2017 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2015, 2016, and 2017 Proxy Statements, including but not limited to, election of directors and ratification of the appointment of an independent auditor.

236. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2015, 2016, and 2017 Proxy Statements.

237. Plaintiff, on behalf of Envision, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

238. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

239. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Envision. Not only is Envision now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Envision by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase nearly $9.2 million of its own shares on the open market at artificially-inflated prices, damaging Envision by millions of dollars.

240. The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

241. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue

and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Envision not misleading.

242. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Envision.

243. The Individual Defendants acted with scienter, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

244. In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director would have signed the Company's false and misleading Form 10-Ks filed with the SEC during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, including Defendants Sanger, Owen, Burt, Holden, Burt, Williams, Riggs, Schnall, Smith and Mactas, who signed the 2014 and 2015 10-

Ks, and Defendants Holden, Gulmi, Sanger, Burt, Deal, Gawaluck, Geringer, Jacobs, Lavender, Miller, Riggs, Schnall, Shelton, Smith and Williams, who signed the 2016 10-K.

245. By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

246. Plaintiff, on behalf of Envision, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

247. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

248. The Individual Defendants, by virtue of their positions with Envision and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Envision and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Envision to engage in the illegal conduct and practices complained of herein.

249. Plaintiff, on behalf of Envision, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

250. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

251. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Envision's business and affairs.

252. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

253. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Envision.

254. In breach of their fiduciary duties owed to the Company, the Individual Defendants caused Envision to engage in the Healthcare Misconduct.

255. The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

256. In further breach of their fiduciary duties owed to Envision, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements of material fact. Specifically, Defendants failed to disclose that: (1) the Company engaged in the Healthcare Misconduct; (2) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of the Healthcare Misconduct; (3) revenues obtained from the EmCare division were likely to be unsustainable after the foregoing conduct came to light; (4) such misconduct, upon discovery, would subject Envision to potential civil and/or criminal sanctions and increased regulatory scrutiny; and (5) the Company failed to maintain internal controls.

257. The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

258. In breach of their fiduciary duties, three of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing its own stock.

259. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Envision's securities and disguising insider sales.

260. The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Envision's securities and engaging in insider sales.

261. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

262. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Envision has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

263. Plaintiff, on behalf of Envision, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

264. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

265. By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Envision.

266. The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Envision that was tied to the performance or artificially inflated valuation of Envision, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

267. Plaintiff, as a shareholder and a representative of Envision, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation (including any performance-based or valuation-based compensation)—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

268. Plaintiff, on behalf of Envision, has no adequate remedy at law.

**SIXTH CLAIM**

**Against Individual Defendants for Abuse of Control**

269. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

270. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Envision, for which they are legally responsible.

271. As a direct and proximate result of the Individual Defendants' abuse of control, Envision has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Envision has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

272. Plaintiff, on behalf of Envision, has no adequate remedy at law.

**SEVENTH CLAIM**

**Against Individual Defendants for Gross Mismanagement**

273. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

274. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Envision in a manner consistent with the operations of a publicly-held corporation.

275. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Envision has sustained and will continue to sustain significant damages.

276. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

277. Plaintiff, on behalf of Envision, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

278. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

279. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Envision to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

280. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

281. Plaintiff, on behalf of Envision, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Envision,

and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Envision;

(c) Determining and awarding to Envision the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Envision and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Envision and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;
2. a provision to permit the shareholders of Envision to nominate at least six candidates for election to the board; and
3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Envision restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 15, 2017

Respectfully submitted,

s/*Paul Kent Bramlett*
Paul Kent Bramlett TN #7387/MS #4291
Robert Preston Bramlett TN #25895
**BRAMLETT LAW OFFICES**
40 Burton Hills, Suite 200
P. O. Box 150734
Nashville, TN 37215
Telephone: 615.248.2828
Facsimile: 866.816.4116
E-mails: PKNASHLAW@aol.com
Robert@BramlettLawOffices.com

***Attorneys for Plaintiff***

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net